## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### CASE NO:

**MARK JOHN YOUNG**,
an Individual,

      Plaintiff,

**vs.**

**MIAMI-DADE COUNTY**, a Political
Subdivision of the State of Florida,
**LEON GLOVER**, an Individual,
**RICKEY WALKER**, an Individual,
**LEONARDO DIAZ**, an Individual,
**COLLESTA THOMPSON**, an Individual,
**CALVIN JONES**, an Individual,
**GINA DISHON MORNO a/k/a GINA
DISHON COX**, an Individual,
**ELVIN JOHNSON**, an Individual,

      Defendants.

_____/

## **COMPLAINT**

Plaintiff, Mark John Young ("Mark") pursuant to Fed. R. Civ. P. 3, sues Defendants, Miami-Dade County ("MDC"), Leon Glover ("Officer Glover"), Rickey Walker ("Officer Walker"), Leonardo Diaz ("Officer Diaz"), Collesta Thompson ("Officer Thompson"), Calvin Jones ("Officer Jones"), Gina Dishon Morno a/k/a Gina Dishon Cox ("Corporal Cox") and Elvin Johnson ("Lieutenant Johnson") (collectively Officer Glover, Officer Walker, Officer Diaz, Officer Thompson, Officer Jones, Corporal Cox and Lieutenant Johnson will be referred to as the "Individual Defendants") and avers:

## PARTIES, JURISDICTION AND VENUE

1.      Mark is an individual residing primarily in Miami-Dade County and is otherwise *sui juris*.

2.      MDC is a political subdivision of the State of Florida organized and existing under the provision of the Florida Constitution.  MDC through its corrections department known as the Miami-Dade Department of Corrections and Rehabilitations ("MDCR") owns and operates a number of correctional facilities including, without limitation, the Miami-Dade Pre-Trial Detention Center ("PTDC"), also known as the "Dade County Jail" or "DCJ."

3.      Officer Glover is an individual correctional officer who worked as an employee of MDCR at the PTDC on all dates relevant to this Complaint.  Officer Glover is sued in his individual capacity for damages.  Upon information and belief, Officer Glover is over the age of eighteen years, primarily resides in Miami-Dade County and is otherwise *sui juris*.

4.      Officer Walker is an individual correctional officer who worked as an employee of MDCR at the PTDC on all dates relevant to this Complaint.  Officer Walker is sued in his individual capacity for damages.  Upon information and belief, Officer Walker is over the age of eighteen years, primarily resides in Miami-Dade County and is otherwise *sui juris*.

5.      Officer Diaz is an individual correctional officer who worked as an employee of MDCR at the PTDC on all dates relevant to this Complaint.  Officer Diaz is sued in his individual capacity for damages.  Upon information and belief, Officer Diaz is over the age of eighteen years, primarily resides in Miami-Dade County and is otherwise *sui juris*.

6.      Officer Thompson is an individual correctional officer who worked as an employee of MDCR at the PTDC on all dates relevant to this Complaint.  Officer Thompson is sued in his individual capacity for damages.  Upon information and belief, Officer Thompson is over the age

of eighteen years, primarily resides in Miami-Dade County and is otherwise *sui juris.*

7.      Officer Jones is an individual correctional officer who worked as an employee of MDCR at the PTDC on all dates relevant to this Complaint.  Officer Jones is sued in his individual capacity for damages.  Upon information and belief, Officer Jones is over the age of eighteen years, primarily resides in Miami-Dade County and is otherwise *sui juris.*

8.      Corporal Cox is an individual Corporal employed by MDCR at the PTDC on all dates relevant to this Complaint.  Corporal Cox is sued in her individual capacity for damages. Upon information and belief, Corporal Cox is over the age of eighteen years, primarily resides in Miami-Dade County and is otherwise *sui juris.*

9.      Lieutenant Johnson is an individual Lieutenant employed by MDCR at the PTDC on all dates relevant to this Complaint.  Lieutenant Johnson is sued in his individual capacity for damages.  Upon information and belief, Lieutenant Johnson is over the age of eighteen years, primarily resides in Miami-Dade County and is otherwise *sui juris.*

10.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of law, of rights secured by the Fourth, Eighth and Fourteenth Amendments to the Constitution of the United States of America.

11.     This action also includes requests for relief based upon claims of negligence, battery, false imprisonment and civil conspiracy under Florida law.

12.     This Court has jurisdiction over Counts I-III of the Complaint pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

13.     This Court has supplemental jurisdiction over the state law claims contained in Counts IV-VII below pursuant to 28 U.S.C. § 1367.

14.     Venue lies in this district pursuant to 28 U.S.C. § 1391, as a substantial part of the

events or omissions giving rise to causes of action set forth in this Complaint occurred in the United States Southern District of Florida.

## GENERAL ALLEGATIONS

### Introduction

15.     As set forth in more detail below, the causes of action which are the subject of this case arise out of Mark's severe beating at the hands of MDC corrections officers at the PTDC and, MDC's neglect, after Mark's beating, to provide any reasonable medical services.

16.     Ultimately, MDC, by and through its agents, left Mark, a Veteran of the United States Army, to suffer internal bleeding **for seven days** before finally transporting him to Kendall Regional Medical Center ("Kendall Regional") where doctors took Mark into emergency surgery and were forced to remove his spleen to save his life, leaving him with substantial, permanent injuries.

### Mark's Arrest, Detention and the Dismissal of All Claims Against Him

17.     Mark is a Veteran of the United States Armed Forces having served his country in, *inter alia,* Guatemala and Panama and being honorably discharged in 1982.

18.     Like many Veterans, after his service, Mark developed and was diagnosed with certain severe psychiatric conditions including, Major Depression, Schizoaffective Disorder and Poly Substance Abuse.

19.     On or about August 26, 2014, Mark was arrested under Miami-Dade Circuit Court Case No. F-14-019369 (the "Criminal Case") and immediately incarcerated in the PTDC.

20.     Prior to August 26, 2014, MDC and the staff at the PTDC were aware of Mark's psychiatric conditions and, accordingly, upon his processing at the PTDC, Mark was assigned to

cell 9B2 on the 9th Floor of the PTDC, which is the floor of the PTDC used by MDC in August of 2014, to house inmates with psychiatric problems.

21. Mark's incarceration was without incident until September 2, 2014 ("Date of Incident"), when, for no apparent reason, Correctional Officer Leon Glover ("Officer Glover") decided to move him to cell 9B3 ("Cell 9B3").

22. Unlike most of the cells on the 9th Floor, Cell 9B3 had only one occupant at the time of Mark's move.

23. The reason for this single occupancy became apparent to Mark when he approached the cell and saw the current occupant in a catatonic state, blankly staring at the ceiling of Cell 9B3.

24. While he may have been in a catatonic state, this unknown inmate had made it perfectly clear that he was not interested in having cell mates. He did this by carefully spreading his own urine and feces across the floor, over the toilet and against the walls of Cell 9B3.

25. Because of the condition of Cell 9B3, Mark objected to being moved to this cell.

26. Officer Glover ignored Mark's objections and ordered him into Cell 9B3.

27. Mark, fearing being locked in a cell with the human waste covering Cell 9B3, sat down in the walkway in front of Cell 9B3 and peacefully refused to enter the putrid cell.

28. Mark's protestations were ignored, without further warning, Officer Glover grabbed Mark by the back of his collar and forcibly threw him into Cell 9B3.

29. Mark continued his objections begging Officer Glover and any other MDC staff members to clean Cell 9B3 or, alternatively, to give him a mop so that he could clean the cell himself. All of Mark's complaints were ignored.

30. Mark, fearing infection from the human waste covering Cell 9B3, eventually decided that he had to attempt to clean Cell 9B3 with the limited items available to him in the cell.

31.     Mark removed the blanket from his bunk and put some soap on it.  Because there was no functional sink in Cell 9B3, Mark was forced to put the blanket in the toilet to soak it and use the blanket as a makeshift mop.

32.     Mark placed the blanket in the toilet and flushed it a couple of times to ensure that it was covered in water.

33.     As Mark was cleaning Cell 9B3 with the soap and blanket, four correctional officers approached the cell.  These officers were: (a) Officer Glover; (b) Officer Walker; (c) Officer Diaz; and (d) a fourth, as yet unidentified correctional officer.

34.     The cell door to Cell 9B3 was opened and Officer Walker and the unidentified correctional officer entered while putting gloves on.  Officers Glover and Diaz remained at the door outside of the cell.

35.     Because they putting gloves on and from the looks on the faces of the officers entering Cell 9B3, Mark became concerned that the officers were going to attack him so he backed up into the corner of the cell.

36.     As he approached, Officer Walker suddenly yelled at Mark: "Fu** you nig***, you gonna flood the cell?"

37.     Without further warning or instruction, Officer Walker punched Mark in the face.

38.     Mark balled up into a fetal position desperately trying to prevent further strikes but Officer Walker struck him with his fists 4-5 more times to Mark's ribs and face and kneed Mark in the sternum.

39.     Both officers then drug Mark to the center of the cell, lifted him up off of his feet and violently slammed him into the floor landing on his head, neck and shoulder.

40.     Leaving Mark balled up on the floor, the officers left Cell 9B3.

41. However, 10-15 minutes later, the cell door opened again and Officer Thompson and Officer Jones entered Cell 9B3.

42. Immediately upon entering, Officer Thompson rushed Mark and hit him twice in the ribs on each side.

43. Officer Jones then said: "[y]ou gonna try my homeboy and flood the cell?  This is my house" at which point he approached Mark and put his boot on the back of Mark's head.

44. The officers then began striking Mark multiple times in his ribs, his chest and back until eventually Mark blacked out from the beating.

45. While Mark can't remember each and every statement made by the officers while they were beating him, he does recall that most, if not all of the statements made by the officers, concerned Mark's lack of respect for the officers and that the officers were teaching him about respect.

46. When Mark regained consciousness Officers Thompson and Jones again approached Cell 9B3 and demanded that Mark: "[c]ome out of the cell."

47. Mark was crying at this point and responded: "[n]o, I can't, you guys are going to whoop me again.  I can't take anymore."

48. The officers entered Cell 9B3, handcuffed Mark and moved him to cell 9C1 in the suicide watch section of the 9th Floor (the "C Wing").

49. Once he was in the C Wing, Mark was approached by Corporal Cox.  Mark immediately asked Corporal Cox for protective custody to protect him from further beatings from the correctional officers.  While Mark was recounting the story of the beating, Lieutenant Johnson approached and listened to Mark's story and then walked away.

**OBRONT COREY, PLLC**
Southeast Financial Center, 200 South Biscayne Boulevard, Suite 2940, Miami, Florida 33131
Phone: 305.373.1040 ▪ Facsimile: 305.373.2040

50.     After listening to Mark's story, Corporal Cox said "[y]ou want protective custody? Ok.  I'm going to put you in protective custody" and walked away.

51.     Once Corporal Cox walked away, Mark saw Corporal Cox speaking with Officer Walker and then said "[o]k, alright" and left the C Wing.

52.      Incredibly, even though he just advised Corporal Cox that he was attacked by, *inter alia,* Officers Walker and Thompson, the two officers approached Mark and simply placed him in a new cell in the C Wing.

53.     Later that same day, Mark was approached by Officer Jones who told Mark: "[s]ee, you in my house."

54.     Mark wasn't fed any lunch that day.  He saw Officer Jones distributing the lunch to the inmates and asked for his lunch.  Officer Jones responded by saying: "[y]ou dry snitching and you expect me to feed you?  I ain't giving you sh**."

55.     Later that day, Mark was visited by an MDC doctor and he told that first MDC doctor about the injuries to his head, neck, back, chest and ribs.

56.     The doctor responded to Mark's claim by telling him that she would give him some pain medication.  However, instead, she simply leaned forward and whispered to Mark "[w]hy did you flood the cell?"  She then left without giving Mark any of the promised pain medication.

57.     Mark was left in the cell in the C Wing for two or three days.  On or about September 4th, Mark was visited by a second MDC doctor.  Mark told this second doctor what happened, explained that the pain in his stomach and ribs had increased since the beating (which Mark later learned was due to the internal bleeding).  That second doctor again promised Mark pain medication but none was provided.

58.     Finally, on or about September 5th Mark was visited by a third MDC doctor who, after evaluating the damage to Mark's ribs, ordered his transfer to the clinic at the PTDC.

59.     Mark was in the clinic until September 7th when, after his attorney advised MDC internal affairs of the beating, he was visited by Correctional Officer Gershon who advised him that he was being moved to the Metro-West Detention Center ("Metro-West"), another jail operated by MDC.

60.     Mark was transported to Metro-West on September 8, 2014.

61.     That night, Mark was in so severe pain, his stomach was severely distended and he was suffering extreme dizziness.

62.     On September 9, 2014 Mark was in so much pain he begged the corrections staff to send him to the clinic as a medical emergency.

63.     Mark was taken for X-Rays but passed out from the pain on the way to the X-Ray room.

64.     Mark was seen by a doctor who listened to Mark's stomach and immediately said: "[h]e he's got internal bleeding! Get him out of here!"

65.     Mark was immediately transported to Kendall Regional and rushed into emergency surgery to repair the internal bleeding.

66.     However, during the first surgery, Mark's doctors discovered that the bleeding was so bad that Mark's spleen could not be saved.

67.     Mark had a second surgery on September 10, 2014 where his medical team was forced to remove Mark's spleen entirely to save his life.

68.     Mark was transported back to the PTDC after his medical care at Kendall Regional but the Criminal Case was dismissed entirely by the Miami-Dade State Attorneys' Office on September 30, 2014.

69.     MDC undertook an internal review of the incident.  On September 17, 2014, Sergeant Katrina Farrington created an incident report for Mark's assault (the "Incident Report"). A copy of the Incident Report is attached as Exhibit A.

70.     Incredibly, despite the life threatening injuries discussed above, the Incident Report concludes that: (a) Mark suffered no injuries in this incident; (b) "AFTER REVIEWING THE INCIDENT REPORTS FROM THE INDIVIDUAL INMATES, THERE WERE NO INCIDENTS REFERENCE ANY ALLEGED ASSAULTS;" and (c) that a disciplinary hearing was not warranted in this case.

### MDC's Long and Documented History of Policies and Practices Which Violate the Constitutional Rights of the Inmates in their Care

71.     While the conditions at the PTDC and the incident described in this Complaint may shock the average citizen, they are very much business as usual at MDC and, in particular the 9th Floor of the PTDC.

72.     In fact, conditions at the PTDC and the other jails operated by MDC were so bad that in 2008, the United States Department of Justice ("DOJ") began an official investigation of MDC for potential violations of the Civil Rights of Institutional Persons Act, 42 U.S.C. § 1997 ("CRIPA").

73.     After years of investigation, on August 24, 2011, the DOJ issued its official "findings" letter to MDC advising MDC of the host of conditions and practices throughout the jails operated by MDC (including the PTDC) which violated the basic constitutional rights of the

individuals being detained by MDC ("Findings Letter").  A copy of the Findings Letter is attached

as Exhibit B.

74.    In summary, as relevant to the claims addressed in this Complaint, the Findings

Letter concludes as to MDC (referred to as MDCR in the Findings Letter) that:

> …[T]here is a **pattern and practice of constitutional violations** in the correctional
> facilities operated by MDCR, and as a result of the unconstitutional operation of
> the Jail, prisoners suffer grievous harm, including death. As described more fully
> below, our specific findings include:
> …
> •    **MDCR fails to provide adequate acute care, chronic care, outpatient
> treatment, and discharge services to prisoners with mental illness.** Instead,
> MDCR inappropriately relies on medication management that fails to consistently
> incorporate diagnoses or treatment plans, even for prisoners with the most serious
> mental illnesses.
>
> •    **MDCR is deliberately indifferent to the serious medical needs of
> prisoner**s **including access to care for acute medical needs**, management of
> chronic health problems, and record keeping and quality assurance. Prisoners wait
> weeks and even months to receive consultations for care from HIV, cardiology, and
> neurology specialists.
> …
> •    **MDCR is engaged in a pattern or practice of using excessive force
> against prisoners. MDCR corrections officers openly engage in abusive and
> retaliatory conduct, which frequently causes injuries to prisoners.**
> …
> The conditions of confinement within the Jail expose prisoners to an unreasonable
> risk of harm from inadequate fire and life safety systems and environmental health
> and sanitation deficiencies, including unreasonable risk of infection from
> overcrowding and inadequate laundry, housekeeping, and pest control.

*See* Findings Letter at p.p. 1-2 (emphasis added).

75.    Concerning the deplorable conditions of the 9th Floor of the PTDC, in particular,

the DOJ found that:

> **Because MDCR staff and prisoners are aware of the horrid conditions on the
> 9-C wing, staff will threaten, punish, and retaliate against prisoners by
> transferring them (or threatening to transfer them) to the 9-C wing.**  For
> example, we reviewed an incident report from March 14, 2008, in which a prisoner
> was kicking his cell door, asking to see a doctor. After the Jail sent a nurse to see

the prisoner, the prisoner continued to kick his door, demanding to see a doctor. The nurse ordered that the prisoner be placed on suicide precautions and, when the prisoner refused to be handcuffed for transport to the ninth floor, officers sprayed him with oleoresin capsicum agent ("OC spray") and escorted him to the 9-C wing. We could not find any documentation in this prisoner's file that indicated this prisoner presented a risk of suicide or had acute mental illness. **We spoke with many prisoners who consistently reported being threatened with transfer to the 9-C wing.**

The conditions of the PTDC ninth floor mental health unit are not new to MDCR and County officials. Over the past several years, print and television news media, as well as a non-fiction book, have reported on the deplorable conditions of the ninth floor. Also chronicling the ongoing inhumane conditions on the ninth floor, a Miami-Dade County grand jury toured the 9-C wing in 2004 and again in 2008, concluding that **'[n]ot much has changed .... The setting was not appropriate for treatment then. It is not appropriate now.'** In February 2009, local state legislators toured the 9-C wing and called it **"inhumane .... a God-awful place.'**

*See* Findings Letter at p.p. 11-12 (footnotes omitted, emphasis added).

76.     The Findings Letter found MDC, as an institution, to be "deliberately indifferent" to the mental health needs of its prisoners because, *inter alia,* "…the constitutional deprivations uncovered by our investigation are not the result of isolated incidents or the misconduct of a few MDCR staff members. Instead, MDCR's deliberate indifference to protecting the Jail's prisoners from harm is a systemic failure." *See* Findings Letter at p.p. 3-4.

77.     The DOJ's finding of a systematic failure in the treatment of prisoners suffering from mental health issues was illustrated in the Findings Letter and DOJ's investigation by examples of:

(a)     MDC's failure to properly assess and screen inmates for mental health issues;

(b)     MDC's routine failure to properly administer medications;

(c)     MDC's failure to correct the "inhumane and unconstitutional" condition of the segregated housing units for prisoners with serious mental illness;

(d)     MDC's failure to provide adequate mental health services or other programming appropriate to the needs of prisoners confined to mental health units;

(e)     MDC's failure to properly document a clear rationale for explaining why inmates are housed in the 9-C wing, rather than a less restrictive setting; and

(f)     MDC's discipline process which fails to account for behaviors that are the product of a mental illness.

*See Generally,* Findings Letter at p.p. 8-12 (p. 10 for quoted materials in subsection (c) above).

78.     Specifically concerning the improper use of discipline and excessive, even retaliatory force against inmates with mental health issues on the 9th Floor, the DOJ found, that: "[a]lthough corrections staff indicated that disciplinary measures are 'rarely used' for mentally ill prisoners, our review of records of disciplinary proceedings against mentally ill prisoners revealed **that they were routinely subject to discipline for their symptomatic behavior."** *See Id.* at p. 13.

79.     In finding that: "MDCR correctional officers routinely use excessive force against Jail prisoners in violation of the Constitution" (against both mentally ill and otherwise healthy prisoners), the DOJ explained:

> MDCR corrections officers openly engage in abusive and retaliatory conduct, which frequently results in injuries to prisoners. **In particular, there is a disturbing and distinct trend of MDCR corrections officers reacting to low level aggression from prisoners (e.g. abusive language or passive resistance to an order) by slapping or punching the prisoner in the head and verbally provoking the prisoner to physically respond.** MDCR corrections officers often do not attempt any de-escalation techniques to combat low level aggression before engaging the prisoner in such an inappropriate manner.

*See Id.* at p. 19 (emphasis added)

80.     In describing their interviews with MDC correction officers, specifically those interviews concerning the MDC policy on use of force and pepper spray, DOJ found that: "[w]hen asked, most officers were unfamiliar with the policy or guessed at responses, offering incomplete answers such as 'when the prisoner doesn't listen to you.'" *Id.*

81.     The Findings Letter discussed five specific incidents (all occurring during the period of DOJ's limited review) which illustrate MDC's "pattern or practice of using excessive force" including:

(a)     A videotaped incident where up to nine corrections officers stood by for several minutes and allowed an officer who had just pepper sprayed an inmate to engage in a fist fight with the inmate.  None of the officers filed a use of force report;

(b)     A videotaped incident during which an MDC corporal physically attacked an inmate by "slapping him in the face several times, punching him in the right side of his face and his right eye, pushing him to the ground and kicking his face and body."  The inmate reported the incident swearing that other corrections officers were present during the attack, that much of the attack occurred out of the view of security cameras and that when he tried to run into the view of the cameras, he was dragged back out of view by the officers.  His second attempt to run toward the camera view was successful but the corporal caught the inmate at the elevators and "choked him and punched him in the side of the face."  MDC internal affairs sustained the prisoner's complaint only to the extent the allegations were caught on camera even though the prisoner's injuries corroborated his full account.  Again, several corrections officers, including a supervisor, either failed to report the incident accurately, or did not report the incident at all;

(c)     An incident during which a corrections officer moved a prisoner who had made derogatory comments about MDC staff to a "visiting booth," and asked the prisoner if he

wanted to fight one of the corrections officers.  Although no use of force incident report was filed, the prisoner somehow sustained a laceration to his eye;

(d)      A videotaped incident from the 9th Floor of the PTDC where an inmate was dragged to a chair by several MDC officers and then handcuffed to a table.  Once handcuffed, the video showed one of the officers punching the side of the inmate's face.  Again, no use of force report was filed; and

(e)      A videotaped incident during which an officer engaged in a conversation with a juvenile inmate; suddenly, and without any physical provocation from the inmate, the officer threw the child onto a table and then the floor.  The video shows the child attempting to protect himself while a second officer stood by and simply looked on.

*Id.* at p.p. 19-20.

82.      In addition to these specific incidents, the Findings Letter concludes that MDC's routine failure to accurately and completely report the use of force against inmates substantially contributes to MDC's pattern and practice of using excessive force against inmates:

> Contributing to this pattern or practice, use of force reporting in the Jail is frequently inaccurate or incomplete, and in incidents involving multiple officers, not all officers are submitting individual reports.  For example, **according to MDCR records, there were 272 use of force incidents in a six-month period from October 2007 through March 2008. Most of the incidents involved physical force or the use of OC spray.  MDCR's Internal Affairs Unit, however, independently reported over 1,000 use of force incidents just involving OC spray in 2007.** This level of discrepancy in use of force reporting generally, and incidents involving OC spray specifically, indicates a serious issue of under-reporting use of force incidents by MDCR officers.

*Id.* at p. 21 (emphasis added, footnote omitted).

83.     The Findings Letter concludes by demanding several remedial measures necessary to correct MDC's continuing pattern and practice of constitutional violations at the jails it operates including, without limitation, the PTDC including, without limitation:

(a)     "Ensur[ing] that prisoners receive treatment that adequately addresses their serious medical needs."

(b)     "Ensur[ing] that prisoners receive acute care in a timely and appropriate manner."

(c)      "Expressly prohibit[ing] the use of force as a response to verbal insults or prisoner threats."

(d)     "Expressly prohibit[ing] the use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety of the institution, prisoners, or staff, unless corrections officers have attempted a hierarchy of documented nonphysical alternatives."

(e)     "Expressly prohibit[ing] the use of force as punishment."

(f)     "Expressly prohibit[ing] the use of punching and slapping to the head, absent exigent circumstances."

(g)     "Ensur[ing] that staff adequately and promptly (within 24 hours) report all uses of force."

(h)     "Ensur[ing] that management review of incident reports, use of force reports, and prisoner grievances alleging excessive or inappropriate uses of force includes a timely review of medical records of prisoner injuries as reported by medical professionals."

(i)      "Ensur[ing] that incident reports, use of force reports and prisoner grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, that it is referred for investigation."

(j)      "Develop[ing] and implement[ing] policies and procedures to ensure adequate cleaning and maintenance of the facilities with meaningful inspection processes and documentation."

(k)      "Ensur[ing] prompt and proper maintenance of shower, toilet, and sink units."

*See Id.* at p.p. 32 (subparagraphs (a) and (b) above), 35 (subparagraphs (c) through (f) above), 36 (subparagraphs (g) through (i) above) and 38.

84.      MDC failed to comply with the requirements of the Findings Letter.  In fact, although DOJ acknowledged progress on some of the items addressed in the Findings Letter, ultimately the DOJ filed suit against MDC to correct its pattern and practice of constitutional violations in the case styled *United States of America v. Miami-Dade Board of County Commissioners, et al.,* United States District Court for the Southern District of Florida Case No. 13-CV-21570-WJZ (the "DOJ Action").

85.      Ultimately, the DOJ Action was resolved by the entry of a Consent Agreement between the DOJ and the Defendants in the DOJ Action ("Consent Agreement") (D.E. 5-2 in the DOJ Action).

86.      The Consent Agreement was adopted as an Order of the Court on May 22, 2013 in the "Final Order Approving the Entering Consent Decree and Dismissing Case without Prejudice" ("Final Judgment on DOJ Action") (D.E. 9 in the DOJ Action).

87.     On April 30, 2013, MDC and the DOJ entered into a separate Settlement Agreement ("Settlement Agreement") requiring MDC to, *inter alia*, revise its use of force training, reporting and implementation policies.  A copy of the Settlement Agreement is attached as Exhibit C.

88.     As evident from the attack and abuse suffered by Mark, as discussed above, despite the Findings Letter, DOJ Action, Consent Agreement, Settlement Agreement and Final Judgment on DOJ Action, as of the date of the Incident and through September 9, 2014 (the date Mark finally received treatment from the wounds suffered at the hands of MDC corrections officers), MDC had clearly done little to revise its pattern, practice and policies of violating the constitutional rights of inmates.

89.     In addition to the facts asserted above, at all times relevant to this action, MDC has been on notice of its policies, customs, patterns and practices described herein from: (a) the findings contained in the Final Report of the Miami-Dade Grand Jury (Spring 2004 Term) dated January 11, 2005 titled "Mental Illness and the Criminal Justice System: A Recipe for Disaster/A Prescription for Improvement" (the "2004 Grand Jury Report") (describing, *inter alia,* the poor state of the Miami-Dade County's jail system and, in particular, the PTDC and, the failures of MDC to adequately care for inmates suffering from mental illness); (b) the findings and recommendations contained in the Final Report of the Miami-Dade County Mayor's Mental Health Task Force dated February 14, 2007 (acknowledging and substantially agreeing with the findings and recommendations of the Grand Jury Report); (c) prior lawsuits (both Federal and State) alleging substantially the same policies, customs, patterns and practices described in this Complaint and too numerous to concisely list herein; and (d) extended local and national media coverage throughout the 2000's and through and including 2014 concerning the poor state of

Miami-Dade County's jail system (in particular the PTDC) and the abuses of prisoners suffered at the hands of MDC correctional staff and other prisoners.

## **Conditions Precedent, Attorneys' Fees and Costs**

90.     On or about October 31, 2014, Mark served MDC with Notice of the claims contained in this Complaint pursuant to the requirements of, *inter alia,* Chapter 728, Fla. Stat. (2014) ("Six Month Notice").  A copy of the Six Month Notice is attached as Exhibit D.

91.     As of the date of this Complaint, MDC has not responded to the request for relief contained in the Six Month Notice.

92.     Mark has retained the undersigned firm to represent him in this action and is obligated to pay a reasonable attorneys' fee and the costs associated with this representation.

93.     All conditions precedent to filing this action have occurred, been satisfied or waived.

## **COUNT I**
## **ACTION FOR VIOLATION OF CONSTITUTIONAL**
## **RIGHTS PURSUANT TO 42 U.S.C. § 1983**
**(Against MDC)**

94.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 10, 12, 14 through 89, 92 and 93 as if fully set forth herein.

95.     This claim is brought against MDC pursuant to 42 U.S.C. § 1983 to redress violations of the Fourth, Eighth and Fourteenth Amendments of the Constitution of the United States.

96.     At all times material hereto, MDC was acting through its departments, employees and agents including, MDCR and the Individual Defendants under color of state law.

**OBRONT COREY, PLLC**
Southeast Financial Center, 200 South Biscayne Boulevard, Suite 2940, Miami, Florida 33131
Phone: 305.373.1040 ▪ Facsimile: 305.373.2040

97.     At all times material hereto, MDC had a custom, policy, pattern and practice of depriving inmates, such as Mark, of constitutional rights guaranteed to them by the Fourth, Eighth and Fourteenth Amendments to the Constitution of the United States of America including, without limitation:

(a)     Failing to provide adequate acute medical care to inmates housed in correctional facilities owned and/or operated by MDC;

(b)     Failing to provide adequate mental health care to inmates housed in correctional facilities owned and/or operated by MDC;

(c)     Using excessive and retaliatory force against inmates housed in correctional facilities owned and/or operated by MDC;

(d)     Using excessive and retaliatory force against inmates suffering from mental health illnesses housed in correctional facilities owned and/or operated by MDC;

(e)     Failing to maintain the PTDC in such a condition as to provide minimum constitutional standards of safety and sanitation;

(f)     Retaliating against inmates who complain about the safety and/or sanitation standards at the PTDC with improper transfer to the 9-C wing of the 9th Floor of the PTDC;

(g)     Failing to properly assess and screen inmates at the PTDC for mental health issues;

(h)     Failing to provide adequate mental health services or other programming appropriate to the needs of prisoners confined to mental health units;

(i)     Failing to properly document a clear rationale for explaining why inmates are housed in the 9-C wing of the PTDC, rather than a less restrictive setting;

(j)     Failing to accurately and completely report use of force incidents at correctional facilities owned and/or operated by MDC;

(k)     Failing to properly review and act on use of force incidents actually reported at correctional facilities owned and/or operated by MDC; and

(l)     Failing to properly train and supervise its agents and employees including, without limitation, the Individual Defendants, to ensure that the constitutional deprivations listed above are eliminated at correctional facilities owned and/or operated by MDC.

98.     MDC's actions and/or failures to act, as identified herein constitute a deliberate indifference to the constitutional rights of inmates, such as Mark.

99.     At all material times, MDC had actual knowledge of the constitutional deprivations listed herein and, that such deprivations posed a pervasive risk of harm to inmates at the PTDC including Mark in violation of the rights granted to Mark by the Fourth, Eighth and Fourteenth Amendments to the Constitution of the United States of America.

100.     MDC's policies, customs, patterns and practices described herein constitute a reckless or a callous indifference to the potential harm suffered by its inmates including Mark.

101.     As a direct and proximate result of: (a) the physical abuse suffered by Mark at the hands of MDC and its agents and employees including, without limitation MDCR and the Individual Defendants; (b) the deliberate indifference to his medical needs by MDC, its employees and agents, including, without limitation, MDCR and the Individual Defendants; and (c) MDC's policies, customs, patterns and practices described herein, Mark was severely injured in and about his extremities, suffered pain therefrom, suffered physical handicaps, disfigurement, mental anguish, loss of capacity for the enjoyment of a normal life, loss of the ability to earn wages in the past and in the future and medical expenses in his care and treatment for said injuries.  Mark's

injuries are either permanent or continuing in nature, and he will continue to suffer loss in the future.

## COUNT II
## ACTION FOR VIOLATION OF CONSTITUTIONAL
## RIGHTS PURSUANT TO 42 U.S.C. § 1983
### (Against the Individual Defendants)

102.    Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 10, 12, 14 through 89, 92 and 93 as if fully set forth herein.

103.    This claim is brought against the Individual Defendants pursuant to 42 U.S.C. § 1983 to redress violations of the Fourth, Eighth and Fourteenth Amendments of the Constitution of the United States.

104.    At all times material hereto, the Individual Defendants were acting under color of state law.

105.    Upon information and belief, none of the Individual Defendants:

(a)    Provided medical care to Mark after he was physically attacked and suffering from internal bleeding;

(b)    intervened in Mark's physical abuse (to the extent it was suffered in their presence);

(c)    Accurately, completely and timely reported the excessive use of force against Mark; or

(d)    Accurately, completely and timely reported Mark's injuries.

106.    As described above, each of the Individual Defendants substantially participated in the deprivation of rights guaranteed to Mark by the Fourth, Eighth and Fourteenth Amendments to the Constitution of the United States of America by doing one or more of the following:

(a)     Using excessive and retaliatory force against Mark while he was incarcerated at the PTDC;

(b)     Failing to provide adequate acute medical care to Mark after he was physically attacked and suffering from internal bleeding;

(c)     Failing to intervene in Mark's physical abuse suffered in their presence at the hands of correctional officers acting under color of state law, even though they were under an obligation to do so;

(d)     Failing to accurately, completely and timely report the excessive use of force against Mark even though they were under an obligation to do so; and/or

(e)     Failing to accurately, completely and timely report Mark's injuries even though they were under an obligation to do so.

107.    Each of the Individual Defendant's actions and/or failures to act, as identified herein constituted a deliberate indifference to Mark's constitutional rights.

108.    As a direct and proximate result of the actions and/or failures to act described above, Mark was severely injured in and about his extremities, suffered pain therefrom, suffered physical handicaps, disfigurement, mental anguish, loss of capacity for the enjoyment of a normal life, loss of the ability to earn wages in the past and in the future and medical expenses in his care and treatment for said injuries.  Mark's injuries are either permanent or continuing in nature, and he will continue to suffer loss in the future.

<u>COUNT III</u>
<u>VIOLATION OF TITLE II OF THE</u>
<u>AMERICANS WITH DISABILITIES ACT</u>
(Against MDC)

109. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 10, 12, 14 through 89, 92 and 93 as if fully set forth herein.

110. This is a claim against MDC for disability discrimination in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12132 which prohibits disability-based discrimination by any public entity.

111. This disability and anti-discrimination law imposes an affirmative duty on public entities to create policies or procedures to prevent discrimination based on disability.

112. Mark was disabled as defined at 42 U.S.C. § 12102(2), as he suffered a mental impairment that substantially limited one or more of his major life activities.

113. Defendant MDC is a program or entity which receives federal financial assistance.

114. Defendant MDC is a public entity as defined by Title II of the ADA.

115. The PTDC, is a facility and its operation comprises a program and service for purposes of Title II of the ADA.

116. Mark was an individual qualified to participate in or receive the benefit of MDC's services, programs, or activities.

117. Mark was abused because of his disabilities by MDC's agents and employees at PTDC. Such abuse constitutes discrimination against an individual based on their disability in violation of Title II of the ADA.

118. MDC's agents and employees discriminated against Mark by abusing him specifically because of his mental illness and excluding him from treatment programs by subjecting him to discrimination. This action is in violation of the ADA

119. MDC discriminated against Mark by failing to provide a non-abusive, safe treatment environment on the 9th Floor and, as a result, Mark suffered substantial injuries.

120.    The abuse of Mark at the PTDC was carried out by Defendant MDC's agents and employees at PTDC while acting within the scope of their employment by MDC.

121.    Defendant MDC is liable for the actions of its agents and employees when they committed the violations of the ADA as alleged herein.

122.    As a result of Defendant MDC's deliberate indifference to ongoing discrimination against Mark as a result of his mental illness, Mark suffered horrific injuries.

## COUNT IV
## NEGLIGENCE
### (Against MDC)

123.    Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 9, 11, 13 through 93 as if fully set forth herein.

124.    This claim is brought against MDC for negligence under Florida law.

125.    MDC owed a duty to Mark as an inmate in custody to operate its facilities, including, without limitation, the PTDC in a reasonably safe manner which included, *inter alia*: (a) maintaining the facilities themselves in a reasonably safe physical condition; (b) providing adequate mental health care to inmates; (c) providing adequate acute medical care to its inmates; and (d) staffing the PTDC with competent, well trained and properly supervised correctional staff.

126.    MDC breached its duty to Mark by, *inter alia*:

(a)    failing to operate the PTDC in a reasonably safe manner and condition by, without limitation, incarcerating Mark on the 9th Floor of the PTDC in cells not fit for human habitation;

(b)    failing to provide an adequate number of security cameras covering all cells of the 9th Floor which would have put all guards and inmates on notice that their actions were being recorded;

**OBRONT COREY, PLLC**
Southeast Financial Center, 200 South Biscayne Boulevard, Suite 2940, Miami, Florida 33131
Phone: 305.373.1040 ▪ Facsimile: 305.373.2040

(c)      failing to provide Mark with adequate mental healthcare treatment as described above;

(d)      failing to timely provide Mark with adequate acute health care after his beating;

(e)      staffing the PTDC with competent, well trained and properly supervised correctional staff.

127.     Moreover, before hiring the Individual Defendants, MDC had a duty to investigate their background, character, training and fitness to ensure their suitability for working at the PTDC.

128.     After hiring the Individual Defendants, MDC had a duty to properly train and supervise them to ensure that they were adequately serving in their positions as correctional officers at the PTDC.

129.     Upon information and belief, MDC hired and employed one or more of the Individual Defendants to serve as correctional officers at MDC's jail facilities including, without limitation, the PTDC without conducting a reasonable background check and/or due diligence investigation to determine the qualifications and/or fitness of the Individual Defendants to serve as correctional officers at MDC jail facilities.

130.     Upon information and belief, after hiring the Individual Defendants, MDC failed to properly train, monitor and supervise the Individual Defendants to ensure that the Individual Defendants remained fit to serve as correctional officers in MDC's jail facilities.

131.     MDC as the principal and employer of Individual Defendants had the ability and authority to prevent the injury to Mark by adequately supervising, training or disciplining Individual Defendants and/or terminating their employment once it became apparent that Individual Defendants were not fit to serve as correctional officers in MDC's jail facilities.

132.    MDC's actions, as set forth above, constitute a failure on MDC's part to conform to the standard of care required of the operator of correctional facilities under Florida law.

133.    MDC's actions, as set forth above, were reckless or wanting in care and constitute a conscious disregard and indifference to the life, safety and rights of others including, without limitation, Mark.

134.    At all times relevant to this claim, the Individual Defendants were employees and agents of MDC and working within the course and scope their employment with MDC.

135.    As a direct and proximate result of MDC's negligence, Mark was severely injured in and about his extremities, suffered pain therefrom, suffered physical handicaps, disfigurement, mental anguish, loss of capacity for the enjoyment of a normal life, loss of the ability to earn wages in the past and in the future, and has incurred medical expenses in his care and treatment for said injuries.  Mark's injuries are either permanent or continuing in nature, and he will continue to suffer loss in the future.

## COUNT V
## BATTERY
### (against Officers Glover, Walker, Thompson and Jones)

136.    Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 4, 6, 7, 11 and 13 through 93 as if fully set forth herein.

137.    This claim is brought against Officers Glover, Walker, Thompson and Jones for battery under Florida law.

138.    Officers Glover, Walker, Thompson and Jones each intentionally made harmful and unlawful contact with Mark.

139.    The conduct of Officers Glover, Walker, Thompson and Jones, as set forth above, was reckless or wanting in care and constitute a conscious disregard and indifference to the life,

safety and rights of others including, without limitation, Mark.

140.   As a direct and proximate result of the unlawful touching, Mark was severely injured in and about his extremities, suffered pain therefrom, suffered physical handicaps, disfigurement, mental anguish, loss of capacity for the enjoyment of a normal life, loss of the ability to earn wages in the past and in the future, and has incurred medical expenses in his care and treatment for said injuries.  Mark's injuries are either permanent or continuing in nature, and he will continue to suffer loss in the future.

### COUNT VI
### FALSE IMPRISONMENT
**(against Officers Glover, Walker, Thompson, Diaz and Jones)**

141.   Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 7, 11 and 13 through 93 as if fully set forth herein.

142.   This claim is brought against Officers Glover, Walker, Thompson, Diaz and Jones for false imprisonment under Florida law.

143.   Officers Glover, Walker, Thompson, Diaz and Jones each individually unlawfully detained Mark by attacking him either: (a) unlawfully battering him while in the custody of MDC; or (b) blocking his escape from Cell 93B once the unlawful battery on him began.

144.   In unlawfully detaining Mark, Officers Glover, Walker, Thompson, Diaz and Jones acted with the purpose of imposing a confinement on Mark in unlawful restraint of his liberty.

145.   The actions of Officers Glover, Walker, Thompson, Diaz and Jones, as set forth above, were reckless or wanting in care and constitute a conscious disregard and indifference to the life, safety and rights of others including, without limitation, Mark.

146.   As a direct and proximate result of the actions of Officers Glover, Walker, Thompson, Diaz and Jones, as set forth in this count, Mark was severely injured in and about his

extremities, suffered pain therefrom, suffered physical handicaps, disfigurement, mental anguish, loss of capacity for the enjoyment of a normal life, loss of the ability to earn wages in the past and in the future, and has incurred medical expenses in his care and treatment for said injuries.  Mark's injuries are either permanent or continuing in nature, and he will continue to suffer loss in the future.

### COUNT VII
### CIVIL CONSPIRACY
### (against All Defendants)

147.    Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 9, 11 and 13 through 93 as if fully set forth herein.

148.    This claim is brought against MDC and the Individual Defendants (collectively the "Defendants") for civil conspiracy under Florida law.

149.    At all times relevant to this claim, MDC was acting through its agents and employees, the Individual Defendants which included, without limitation, a senior correctional supervisor in Corporal Cox and a senior administrator in Lieutenant Johnson.

150.    The Defendants were parties to a civil conspiracy.

151.    The Defendants conspired to do an unlawful act or, alternatively, a lawful act by unlawful means.

152.    Specifically, as discussed above, Defendants conspired to batter Mark, deny Mark appropriate acute medical care and/or cover up the battery of Mark to their mutual benefit.

153.    Defendants committed an overt act in furtherance of their conspiracy by:

(a)     battering Mark;

(b)     refusing to provide Mark with appropriate acute medical care once he was injured; and/or

(c)     covering up the battery of Mark by, *inter alia,* refusing to investigate his allegations of battery and/or creating the false Incident Report finding no basis for Mark's claims.

154.    The conduct of the Defendants, as set forth above, was reckless or wanting in care and constitute a conscious disregard and indifference to the life, safety and rights of others including, without limitation, Mark.

155.    As a direct and proximate result of Defendant's unlawful conspiracy, Mark was severely injured in and about his extremities, suffered pain therefrom, suffered physical handicaps, disfigurement, mental anguish, loss of capacity for the enjoyment of a normal life, loss of the ability to earn wages in the past and in the future, and has incurred medical expenses in his care and treatment for said injuries.  Mark's injuries are either permanent or continuing in nature, and he will continue to suffer loss in the future.

**WHEREFORE**, Plaintiff demands relief as follows:

(a)     On Count I, for entry of a judgment for damages against MDC and in favor of Plaintiff, including, without limitation, all damages caused by the Individual Defendants for which MDC is vicariously liable, for past and future medical expenses and other actual damages, past and future pain and suffering including, without limitation, emotional distress, punitive damages, pre-judgment interest, attorneys' fees and costs;

(b)     On Count II, for entry of a judgment for damages against the Individual Defendants, jointly and severally, and in favor of Plaintiff including, without limitation, past and future medical expenses and other actual damages, past and future pain and suffering including, without limitation, emotional distress, punitive damages, pre-judgment interest attorneys' fees and costs; and

(c)     On Count III, for entry of a judgment for damages against MDC and in favor

of Plaintiff, including, without limitation, all damages caused by the Individual Defendants for which MDC is vicariously liable, for past and future medical expenses and other actual damages, past and future pain and suffering including, without limitation, emotional distress, punitive damages, pre-judgment interest, attorneys' fees and costs;

(d)     On Count IV, for entry of a judgment for damages against MDC and in favor of Plaintiff, including, without limitation, all damages caused by MDC's agents and employees, for past and future medical expenses and other actual damages, past and future pain and suffering including, without limitation, emotional distress, punitive damages and pre-judgment interest;

(e)     On Count V, for entry of a judgment for damages against Officers Glover, Walker, Thompson and Jones, jointly and severally, and in favor of Plaintiff, including, without limitation, past and future medical expenses and other actual damages, past and future pain and suffering including, without limitation, emotional distress, punitive damages and pre-judgment interest;

(f)     On Count VI, for entry of a judgment for damages against Officers Glover, Walker, Thompson, Diaz and Jones, jointly and severally, and in favor of Plaintiff, including, without limitation, past and future medical expenses and other actual damages, past and future pain and suffering including, without limitation, emotional distress, punitive damages and pre-judgment interest;

(g)     On Count VII, for entry of a judgment for damages against all Defendants, jointly and severally, and in favor of Plaintiff, including, without limitation, past and future medical expenses and other actual damages, past and future pain and suffering including, without limitation, emotional distress, punitive damages and pre-judgment interest; and

(h)      On all Counts, for such other and further relief as this Court deems just and proper under the circumstances.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff demands trial by jury on any issues so triable.

Dated: September 8, 2016.

Respectfully submitted,

**OBRONT COREY, PLLC**
Attorneys for Plaintiff
Southeast Financial Center
200 South Biscayne Boulevard, Suite 2940
Miami, Florida 33131
Phone: (305) 373-1040
Fax:    (305) 373-2040
E-mail: mcorey@obrontcorey.com
E-mail: trpoole@obrontcorey.com

By: */s/ Michael James Corey*
   **MICHAEL JAMES COREY**
   Florida Bar No. 43598
   **THOMAS RICHARD POOLE**
   Florida Bar No. 41931